

**U.S. Department of Justice**

*United States Attorney*
*District of Connecticut*

*Connecticut Financial Center*  (203) 821-3700
*157 Church Street, 25th Floor*  Fax (203) 773-5376
*New Haven, Connecticut 06510*  www.justice.gov/usao/ct

September 11, 2017

Brian E. Spears, Esq.
Spears Manning LLC
2425 Post Road, Suite 203
Southport, CT 06890

Re:   United States v. John DiMenna
      Case No. 3:17CR202(VAB)

Dear Attorney Spears:

This letter confirms the plea agreement between your client, John DiMenna (the "defendant"), and the United States Attorney's Office for the District of Connecticut (the "Government") concerning the referenced criminal matter.

## THE PLEA AND OFFENSE

The defendant agrees to waive his right to be indicted and to plead guilty to a two-count Information charging him with (1) wire fraud affecting a financial institution and (2) wire fraud of various victim investors, both in violation of 18 U.S.C. § 1343.

The defendant understands that, to be guilty of each offense of wire fraud, the following essential elements of the offense must be satisfied:

1.   There was a scheme to defraud or to obtain money or property by materially false and fraudulent pretenses, representations or promises, as alleged in the Information;

2.   Money or property was the object of the scheme;

3.   The defendant knowingly and willfully participated in the scheme to defraud with knowledge of its fraudulent nature and with the specific intent to defraud;

4.   In execution of the scheme, the defendant caused the use of interstate wires as specified in the Information; and

5.   As to Count 1, the scheme affected a financial institution.

Brian E. Spears, Esq.
*Page 2*

## THE PENALTIES

Count 1 carries a maximum penalty of 30 years of imprisonment and an approximately $139.234 million fine (twice the relevant loss of approximately $69.617 million under the alternate fine provision). In addition, under 18 U.S.C. § 3583, the Court may impose a term of supervised release of not more than 5 years to begin after imprisonment. The defendant understands that, should he violate any condition of supervised release, he may be required to serve a further term of imprisonment of up to 3 years per violation pursuant to 18 U.S.C. § 3583 with no credit for time already spent on supervised release.

Count 2 carries a maximum penalty of 20 years of imprisonment and an approximately $139.234 million fine (twice the relevant loss of approximately $69.617 million under the alternate fine provision). In addition, under 18 U.S.C. § 3583, the Court may impose a term of supervised release of not more than 3 years to begin after imprisonment. The defendant understands that, should he violate any condition of supervised release, he may be required to serve a further term of imprisonment of up to 2 years per violation pursuant to 18 U.S.C. § 3583 with no credit for time already spent on supervised release.

Under both Counts, the defendant is also subject to the alternative fine provision of 18 U.S.C. § 3571. Under this section, the maximum fine that may be imposed on the defendant is the greatest of the following amounts: (1) twice the gross gain to the defendant resulting from the offense; (2) twice the gross loss resulting from the offense (namely, approximately $139.234 million); (3) $250,000; or (4) the amount specified in the section defining the offense.

In addition, the defendant is obligated by 18 U.S.C. § 3013 to pay a special assessment of $100 on each count of conviction, for a total of $200. The defendant agrees to pay the special assessment to the Clerk of the Court on the day the guilty plea is accepted.

The defendant is also subject to restitution, as discussed below. Unless otherwise ordered, should the Court impose a fine or restitution of more than $2,500 as part of the sentence, interest will be charged on the unpaid balance of the fine or restitution not paid within 15 days after the judgment date. 18 U.S.C. § 3612(f). Other penalties and fines may be assessed on the unpaid balance of a fine or restitution pursuant to 18 U.S.C. § 3572 (h), (*i*) and § 3612(g).

### Restitution

In addition to the other penalties provided by law, the Court must also order that the defendant make restitution under 18 U.S.C. § 3663A, and the Government reserves its right to seek restitution on behalf of victims consistent with the provisions of § 3663A. The scope and effect of the order of restitution are set forth in the attached Rider Concerning Restitution. Restitution is payable immediately unless otherwise ordered by the Court.

Brian E. Spears, Esq.
*Page 3*

   The defendant agrees to make restitution to the victims in the amounts set forth in an itemized list to be provided to the Probation Office during the presentence investigation in the amount of approximately $87,842,539.16, which includes both fraud and non-fraud losses.[1]

## THE SENTENCING GUIDELINES

### Applicability

   The defendant understands that the Court is required to consider any applicable Sentencing Guidelines as well as other factors enumerated in 18 U.S.C. § 3553(a) to tailor an appropriate sentence in this case and is not bound by this plea agreement. The defendant agrees that the Sentencing Guideline determinations will be made by the Court, by a preponderance of the evidence, based upon input from the defendant, the Government, and the United States Probation Office. The defendant further understands that he has no right to withdraw his guilty plea if his sentence or the Guideline application is other than he anticipated, including if the sentence is outside any of the ranges set forth in this agreement.

### Acceptance of Responsibility

   At this time, the Government agrees to recommend that the Court reduce by two levels the defendant's adjusted offense level under § 3E1.1(a) of the Sentencing Guidelines, based on the defendant's prompt recognition and affirmative acceptance of personal responsibility for the offense. Moreover, should the defendant qualify for a decrease under § 3E1.1(a) and his offense level determined prior to the operation of subsection (a) is level 16 or greater, the Government will file a motion with the Court pursuant to § 3E1.1(b) which recommends that the Court reduce the defendant's Adjusted Offense Level by one additional level based on his prompt notification of his intention to enter a plea of guilty. The defendant understands that the Court is not obligated to accept the Government's recommendations on the reductions.

   The above-listed recommendations are conditioned upon the defendant's affirmative demonstration of acceptance of responsibility, by (1) truthfully admitting the conduct comprising the offense(s) of conviction and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 of the Sentencing Guidelines, and (2) truthfully disclosing to the United States Attorney's Office and the United States Probation Office personal information requested, including the submission of a complete and truthful financial statement detailing the defendant's financial condition.

   In addition, the Government expressly reserves the right to seek denial of the adjustment for acceptance of responsibility if the defendant engages in any acts, unknown to the Government at the time of the signing of this agreement, which (1) indicate that the defendant has not terminated or withdrawn from criminal conduct or associations (§ 3E1.1 of the Sentencing Guidelines); (2) could provide a basis for an adjustment for obstructing or impeding

---

[1] The defendant has acknowledged owing investors approximately $87,842,539. The parties acknowledge that these losses comprise both fraud and non-fraud losses. Rather than unnecessarily prolong the sentencing process, the defendant has agreed to a restitution order that comprises all losses, rather than just limiting the order to fraud-related losses.

Brian E. Spears, Esq.
*Page 4*

the administration of justice (§ 3C1.1 of the Sentencing Guidelines); or (3) constitute a violation of any condition of release. Moreover, the Government reserves the right to seek denial of the adjustment for acceptance of responsibility if the defendant seeks to withdraw his guilty plea or takes a position at sentencing, or otherwise, which, in the Government's assessment, is inconsistent with affirmative acceptance of personal responsibility. The defendant understands that he may not withdraw his plea of guilty if, for the reasons explained above, the Government does not make one or both of the recommendations or seeks denial of the adjustment for acceptance of responsibility.

### Stipulation

Pursuant to § 6B1.4 of the Sentencing Guidelines, the defendant and the Government have entered into the attached stipulation, which is a part of this plea agreement. The defendant understands that this stipulation does not set forth all of the relevant conduct and characteristics that may be considered by the Court for purposes of sentencing. The defendant understands that this stipulation is not binding on the Court. The defendant also understands that the Government and the United States Probation Office are obligated to advise the Court of any additional relevant facts that subsequently come to their attention.

### Guideline Stipulation

The parties agree as follows:

The Guidelines Manual in effect on the date of sentencing is used to determine the applicable Guidelines range.

- The defendant's base offense level under U.S.S.G. § 2B1.1 is 7.[2]

- The Government submits that the base offense level is increased by 24 levels as the Guidelines fraud loss falls between $65 million and $150 million. U.S.S.G. § 2B1.1(b)(1)(M). The defense reserves the right to argue that the loss is just less than $65 million and that the level is increased by 22 levels as the loss falls between $25 million and $65 million.

- The offense involved 10 or more victims, resulting in an additional 2 level enhancement. U.S.S.G. § 2B1.1(b)(2)(A)(i).

- The parties agree that the continuing relationship between the defendant and a number of individual investors, who invested in multiple investment properties during the course of the scheme, resulted in an abuse of position of private trust warranting a 2-level enhancement under U.S.S.G. § 3B1.3.

---

[2] Under either Count, the parties submit that the Guidelines determination would be the same, as the applicable Chapter 2 Guidelines calculations are driven by aggregate loss and relevant conduct. The parties have also determined that the Guidelines calculation under earlier applicable Guidelines (the November 2015 Guidelines) would result in the same sentencing range.

Brian E. Spears, Esq.
*Page 5*

As a result, under the Government's calculations, the adjusted offense level is 35. Three levels are subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility, as noted above, resulting in a total offense level of 32 under the Government's calculation. The defense reserves the right to argue for a total offense level of 30 in light of the possible disagreement on total fraud loss.

Based on an initial assessment, the parties agree that the defendant falls within Criminal History Category I. The parties reserve the right to recalculate the defendant's Criminal History Category and corresponding sentencing ranges if this initial assessment proves inaccurate.

A total offense level of 32, assuming a Criminal History Category I, would result in a Guidelines sentencing range of 121 to 151 months of imprisonment (sentencing table) and a fine range of $35,000 to $350,000, U.S.S.G. § 5E1.2. The defendant is also subject to a supervised release term of 2 to 5 years. U.S.S.G. § 5D1.2 (involving a class B felony).

A total offense level of 30, with the same Criminal History Category I, would result in a Guidelines sentencing range of 97 to 121 months of imprisonment (sentencing table) and a fine range of $30,000 to $300,000, U.S.S.G. § 5E1.2. The defendant is also subject to a supervised release term of 2 to 5 years. U.S.S.G. § 5D1.2 (involving a class B felony).

The Government and the defendant reserve their rights to seek a departure or a non-Guidelines sentence, and both sides reserve their rights to object to a departure or a non-Guidelines sentence. In fact, the defendant seeks to advance certain departure or variance arguments, including that the loss overstates the seriousness of the offense and the defendant's age mitigates the need for a Guidelines sentence.

Notwithstanding the above, the parties agree that the defendant is entitled to a downward departure or variance from the relevant guidelines range for multiple steps taken to assist the government and the civil authorities, as will be outlined for the Court at sentencing, at which point the Court may determine to credit the departure/variance and determine what weight, if any, to give it.

The defendant understands that the Court is not bound by this agreement on the Guideline ranges specified above. The defendant further understands that he will not be permitted to withdraw the guilty plea if the Court imposes a sentence outside any of the ranges set forth in this agreement.

In the event the United States Probation Office or the Court contemplates any sentencing calculations different from those stipulated by the parties, the parties reserve the right to respond to any inquiries and make appropriate legal arguments regarding the proposed alternate calculations. Moreover, the parties reserve the right to defend any sentencing determination, even if it differs from that stipulated by the parties, in any post-sentencing proceeding.

Brian E. Spears, Esq.
*Page 6*

### Waiver of Right to Appeal or Collaterally Attack Conviction and Sentence

The defendant acknowledges that under certain circumstances he is entitled to challenge his conviction and sentence. The defendant agrees not to appeal or collaterally attack his conviction in any proceeding, including but not limited to a motion under 28 U.S.C. § 2255 and/or § 2241. Nor will he pursue such an appeal or collateral attack to challenge the sentence imposed by the Court if that sentence does not exceed 121 months of imprisonment, a 5-year term of supervised release, a $200 special assessment, a fine of $350,000 and the restitution agreed to above ($87,842,539) even if the Court imposes such a sentence based on an analysis different from that specified above. Similarly, the Government will not appeal a sentence imposed within or above the stipulated sentencing range. The Government and the defendant agree that the waivers noted above apply regardless of whether the term of imprisonment is imposed to run consecutively to or concurrently with, in whole or in part, the undischarged portion of any other sentence that has been imposed on the defendant at the time of sentencing in this case. The defendant acknowledges that he is knowingly and intelligently waiving these rights. Furthermore, the parties agree that any challenge to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentence that is inconsistent with (or not addressed by) this waiver. Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

### Information to the Court

The Government reserves its right to address the Court with respect to an appropriate sentence to be imposed in this case. Moreover, the Government will discuss the facts of this case, including information regarding the defendant's background and character, 18 U.S.C. § 3661, with the United States Probation Office and will provide the Probation Officer with access to material in its file, with the exception of grand jury material.

## WAIVER OF RIGHTS

### Waiver of Right to Indictment

The defendant understands that he has the right to have the facts of this case presented to a federal grand jury, consisting of between sixteen and twenty-three citizens, twelve of whom would have to find probable cause to believe that he committed the offense set forth in the information before an indictment could be returned. The defendant acknowledges that he is knowingly and intelligently waiving his right to be indicted.

### Waiver of Trial Rights and Consequences of Guilty Plea

The defendant understands that he has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent him.

The defendant understands that he has the right to plead not guilty or to persist in that plea if it has already been made, the right to a public trial, the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against him, the right not to be compelled to incriminate himself, the right to testify and present evidence, and the right to compel the attendance of witnesses to testify in his defense. The defendant understands that by pleading guilty he waives those rights and that, if the plea of guilty is accepted by the Court, there will not be a further trial of any kind.

The defendant understands that, if he pleads guilty, the Court may ask him questions about each offense to which he pleads guilty, and if he answers those questions falsely under oath, on the record, and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making false statements.

### Waiver of Statute of Limitations

The defendant agrees that, should the conviction following defendant's guilty plea be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this plea agreement (including any indictment or counts the Government has agreed to dismiss at sentencing pursuant to this plea agreement) may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement or reinstatement of such prosecution. The defendant agrees to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date the plea agreement is signed.

## ACKNOWLEDGMENT OF GUILT AND VOLUNTARINESS OF PLEA

The defendant acknowledges that he is entering into this agreement and is pleading guilty freely and voluntarily because he is guilty. The defendant further acknowledges that he is entering into this agreement without reliance upon any discussions between the Government and him (other than those described in the plea agreement letter), without promise of benefit of any kind (other than the concessions contained in the plea agreement letter), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges his understanding of the nature of the offense to which he is pleading guilty, including the penalties provided by law. The defendant also acknowledges his complete satisfaction with the representation and advice received from his undersigned attorney. The defendant and his undersigned counsel are unaware of any conflict of interest concerning counsel's representation of the defendant in the case.

## SCOPE OF THE AGREEMENT

The defendant acknowledges that this agreement is limited to the undersigned parties and cannot bind any other federal authority, or any state or local authority. The defendant acknowledges that no representations have been made to him with respect to any civil or administrative consequences that may result from this plea of guilty because such matters are solely within the province and discretion of the specific administrative or governmental entity

Brian E. Spears, Esq.
*Page 8*

involved. Finally, the defendant acknowledges that this agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving him.

## COLLATERAL CONSEQUENCES

The defendant understands that he will be adjudicated guilty of each offense to which he has pleaded guilty and will be deprived of certain rights, such as the right to hold public office, to serve on a jury, to possess firearms and ammunition, and in some states, the right to vote. Further, the defendant understands that, if he is not a citizen of the United States, a plea of guilty may result in removal from the United States, denial of citizenship, and denial of admission to the United States in the future. The defendant understands that pursuant to section 203(b) of the Justice for All Act, the Federal Bureau of Prisons or the United States Probation Office will collect a DNA sample from the defendant for analysis and indexing. Finally, the defendant understands that the Government reserves the right to notify any state or federal agency by which he is licensed, or with which he does business, as well as any current or future employer of the fact of his conviction.

## SATISFACTION OF FEDERAL CRIMINAL LIABILITY; BREACH

The defendant's guilty plea, if accepted by the Court, will satisfy the federal criminal liability of the defendant in the District of Connecticut as a result of his participation in the schemes to defraud, which form the basis of the Information in this case and any related conduct.

The defendant understands that if, before sentencing, he violates any term or condition of this agreement, engages in any criminal activity, or fails to appear for sentencing, the Government may void all or part of this agreement. If the agreement is voided in whole or in part, defendant will not be permitted to withdraw his guilty plea.

## NO OTHER PROMISES

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this plea agreement, and none will be entered into unless set forth in writing, signed by all the parties.

This letter shall be presented to the Court, in open court, and filed in this case.

Very truly yours,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

CHRISTOPHER W. SCHMEISSER
ASSISTANT UNITED STATES ATTORNEY

    The defendant certifies that he has read this plea agreement letter and its attachment(s) or has had it read or translated to him, that he has had ample time to discuss this agreement and its attachment(s) with counsel and that he fully understands and accepts its terms.

_____       9/11/2017
JOHN DIMENNA                Date
The Defendant

    I have thoroughly read, reviewed and explained this plea agreement and its attachment(s) to my client who advises me that he understands and accepts its terms.

_____      9/11/17
BRIAN E. SPEARS           Date
Attorney for the Defendant

Brian E. Spears, Esq.
*Page 10*

## **STIPULATION OF OFFENSE CONDUCT**

The defendant JOHN DIMENNA and the Government stipulate to the following offense conduct that gives rise to the defendant's agreement to plead guilty to the Information:

At all times relevant to this Information, the defendant JOHN DIMENNA worked in Connecticut in the commercial real estate industry. In his business, DIMENNA arranged for the purchase and development of large commercial real estate projects, including hotels or multi-tenant properties with hundreds of apartments. DIMENNA oversaw the managing of the projects, including relevant construction or renovation, and was responsible for the payment of lenders and other investors in the projects. During the relevant time, DIMENNA and his business partners, through various entities, purchased or held approximately 12 large commercial real estate properties with a worth of over $150 million.

To raise capital for each real estate project, DIMENNA and his business partners sold membership interests to outside investors in each LLC that owned or was to purchase a designated commercial property. DIMENNA also sold interests to investors in other LLCs that did not own specific properties but were to have some involvement in certain projects, including such LLCs as Seaboard Realty LLC, Seaboard Stamford Investment Group (SSIG), and Seaboard Properties Group LLC. In certain instances, DIMENNA also sold to investors shares in LLCs that were already fully subscribed, namely that DIMMENA had already sold 100% membership interests in the respective LLCs. While a number of the above-mention investors received distributions during the relevant time, most lost money on their investment.

During the relevant time, various financial institutions and other entities provided financing for DIMENNA's commercial real estate projects, including loaning millions of dollars to purchase, renovate or construct the properties. In providing financing, the institutions obtained mortgage interests in the properties and/or additional security interests. As discussed in greater detail below, institutional lenders, including financial institutions, that obtained first or second leasehold mortgage in the properties and ultimately lost significant monies included Citizens Bank (FDIC insured), Cedar Hill Capital, LLC, and Israel Discount Bank of New York (FDIC insured). Lenders that provided financing, but had a lesser security interest and ultimately lost significant monies included Israel Discount Bank of New York, UCF 1 Trust 1, CPR Money, LLC, and First County Bank (FDIC insured). An additional lender, Patriot National Bank (FDIC insured), financed a portion of a project run by DIMENNA, was afforded a security interest in the property, and ultimately lost significant monies.

Each of the various investors set forth above are collectively referred to as the "Victim Investors"; the financial institutions and other lenders set forth above are collectively referred to as the "Victim Lenders;" and the two groups are collectively referred to as "the Victims."

Prior to the events at issue, DIMENNA had a forty-year background in the construction and real estate businesses, first working in his family's construction business and then branching into real estate development and investment and the managing of investment properties. Long before the events at issue in this Information, DIMENNA developed a business relationship with two other investors and worked to create a commercial real estate investment portfolio with those

two investors. The three formed Seaboard Property Incorporated (Seaboard Property), a Subchapter S corporation (pursuant to Chapter 1, Subchapter S, of the Internal Revenue Code), in which DIMENNA was a 50% owner, and the two other partners each held a 25% interest. Beginning in or about 2000, Seaboard Property acted as a general partner in specific LLCs with each LLC holding as its principal asset one commercial real estate property. Approximately each year, the group added one LLC with a new commercial property to their portfolio. In or about 2000, DIMENNA also formed Seaboard Realty, LLC (Seaboard Realty) to be the general or managing partner of certain LLCs created in the future. DIMENNA owned 50% of Seaboard Realty, and the two other investors each owned 25%.

In expanding their holdings, DIMENNA and his business partners purchased commercial real estate property, typically an apartment building or hotel, using a multi-layered limited liability corporation (LLC) structure. Typically, either Seaboard Property or Seaboard Realty would take a 25% interest as the managing member in an LLC that had been created to purchase the LLC that owned the commercial property. DIMENNA would prepare the financial projections for the properties, and his two business partners would assist in finding others to purchase the remaining 75% membership interests in funding the LLC. The monies obtained from the various investors combined with financing obtained by lenders provided sufficient funds to purchase the underlying commercial property and provide any other necessary operating capital for the commercial property. While a portion of the financing for the project would come from the initial investors, the LLC would obtain approximately seventy percent of the financing to purchase and/or run the apartment building or hotel though loans provided by financial institutions. The financial institutions would receive standard interest and principal payments on the debt. The investors in the funding LLC would receive a percentage of the profit earned by the venture each year as well as a preferred return.

In 2007, DIMENNA and his business partners, believing that the market was eroding, agreed to sell a number of the 12 large properties owned by the various LLCs. By early 2008, they had sold eight of the properties to one purchaser for approximately $120 million. After repaying lenders, DIMENNA and his two main partners distributed to the investors in the relevant project the profit obtained from the property's sale. DIMENNA and his business partners and relevant investors continued to retain the remaining four properties in their corresponding LLCs, including, as relevant to this Information, Century Plaza (100 Prospect Street, Stamford), a high-end residential apartment building with 82 apartments, and 220 Elm Street, an office building in the heart of New Canaan.

After the sales in 2007, DIMENNA and his business partners reevaluated the real estate market and over the next several years reinvested in real estate obtaining approximately $160 million in financing from financial institutions, other lenders and member investors for new projects, with much of that financing later refinanced in 2014 and 2015. (At least one of the properties DIMENNA and his two partners purchased without other members.) The new properties purchased included:

a. **One Atlantic Street**, Stamford, Connecticut – a nine story multi-tenanted building with both office and retail space, which was purchased without limited partners.

Brian E. Spears, Esq.
*Page 12*

b. **88 Hamilton Avenue,** Stamford – a mixed-use office/flexible use warehouse building.

c. **Marriott Courtyard** (275 Summer Street/71-79 Broad Street), Stamford – a nine-story, 115 guest room hotel.

d. **Park Square West** (101 Summer Street), Stamford – a nine-story high-end apartment building with 143 apartments and ground retail space.

e. **Marriott Residence Inn** (23-25 Atlantic Street, 37 Atlantic Street, 35 Atlantic Street), Stamford – a three parcel development project, now approximately 50% complete, to be a long term stay Marriott Residence Inn with 156 rooms.

f. **The Clocktower,** Norwalk – a 129-unit condominium building.

g. **300 Main Street,** Stamford – an eight-story multi-tenanted building with office and retail space.

In addition, DIMENNA and his partners purchased:

h. **25 Bank Street,** Stamford – a development site with approval to construct 16 apartments and retail space.

## Scheme to Defraud

Beginning in or about 2010 and continuing through in or about March 2016, in the District of Connecticut and elsewhere, DIMENNA engaged in a scheme to defraud the Victims by various material misrepresentations, described in the paragraphs that follow:

During all relevant times, DIMENNA oversaw each project, including each entity's profitability, its cash flow, operating cash needs and any additional funds needed for repairs or renovations.

During the course of the scheme, DIMENNA knew that certain of his properties that were not cash positive. Rather than disclose that fact, DIMENNA used funds from legally separate cash-positive entities to support capital improvements, construction, and operating expenditures in other LLCs that needed the cash. In addition, DIMENNA began using funds from cash positive entities to continue to make required interest and preferred returns to investors of any entity that he managed, regardless of the true available cash that an entity might have to fund such payments.

As a further part of the scheme, DIMENNA would prepare each quarter a spreadsheet of the properties which reflected the cash position, cash flow and expenses for each project, which he shared with his two principal business partners. DIMENNA materially inflated the projected cash flows of the projects so they would appear much stronger financially to his partners, who he knew would be marketing the ventures to potential investors. DIMENNA would inflate operating projections by as much as 20% by willfully underestimating expenses and

Brian E. Spears, Esq.
*Page 13*

overestimating income. DIMENNA also began to provide his business partners with false sales contracts, false lease commitments and other false documents concerning the status and prospect of the various real estate investments. DIMENNA also began to enter into financing agreements with lenders without the knowledge, consent or authorization of his two business partners.

During the scheme, DIMENNA provided lenders and appraisers with inaccurate financial data concerning the various real estate properties and other entities used to collateralize various loans, including providing lenders with overstated income figures, understated expense figures, false personal financial statements, false bank statements, and false tax returns relating to the properties. DIMENNA failed to disclose to potential lenders material intercompany debt obligations and all unrecorded liens on particular properties. DIMENNA also created false releases of liens and UCC filing documents.

DIMENNA often sought financing from various lenders without informing existing lenders of prior loans secured by the property at issue, entered loan agreements with lenders without recording such agreements, and forged the names of his two business partners on various documents without their knowledge to secure financing, including providing personal guarantee documents that he had fabricated.

DIMENNA provided existing investors inaccurate financial information in order to induce investors not to withdraw an investment and provided prospective investors false information about a project's financial viability to induce them to invest. DIMENNA would frequently receive a template from his accounting manager that set forth actual financial figures relating to the property. DIMENNA would routinely change the numbers to make the figures appear stronger. In other instances, DIMENNA would simply create his own template with his own false figures and then provide the summaries to current and potential investors.

DIMENNA also sold investors equity in certain entities, such as the entity that owned **88 Hamilton Avenue**, at a time when DIMENNA knew the entities were fully subscribed and thus not eligible for receiving investment monies.

Solely by way of example, certain of the material misrepresentations made to the Victims include:

a. In seeking refinancing of **Century Plaza**, DIMENNA submitted financial material to Citizens Bank in December 2013 that included various misrepresentations, including false financial information and fraudulent guarantees. Citizens Bank extended loans totaling approximately $21 million and has suffered a loss of approximately $2.21 million on the property.

b. In seeking refinancing of **One Atlantic Street**, DIMENNA submitted financial information and fraudulent guarantees to Citizens Bank in October 2013. Citizens Bank extended loans totaling over $20 million and has suffered a loss of approximately $1.5 million.

c. In seeking financing of **Park Square West**, DIMENNA submitted false financial material and fraudulent guarantees to UCF-1 in November 2012 and March 2014. UCF-1

Brian E. Spears, Esq.
*Page 14*

extended loans in excess of $15 million and has suffered a loss of approximately $11 million. In addition, DIMENNA submitted false financial information and fraudulent guarantees to Israel Discount Bank in September 2013. Israel Discount Bank extended loans of approximately $5 million and has suffered a loss of approximately $4.75 million.

d.  In seeking the financing for the **Marriott Residence Inn**, DIMENNA submitted false financial material and fraudulent guarantees to Israel Discount Bank in December 2012, July 2014 and February 2015. Israel Discount Bank extended loans of approximately $18 million and has suffered a loss of approximately $5.75 million. In seeking financing for the **Marriott Residence Inn** in or about October 2014 and October 2015, DIMENNA submitted false financial information and fraudulent guarantees to CPR Money LLC. In November 2014 and November 2015, CPR Money LLC extended loans in excess of $4.4 million and has suffered a loss of approximately $4.4 million.

e.  In seeking the financing for **300 Main Street**, DIMENNA submitted false financial information and fraudulent guarantees to First County Bank in September 2013. First County Bank extended loans of approximately $2 million and has suffered a loss of approximately $2 million.

f.  In seeking the financing for **Seaboard Realty LLC**, DIMENNA submitted false financial materials and fraudulent guarantees to Patriot National Bank in or about July 2014. Patriot National Bank extended loans in July 2014 of approximately $2.5 million and has suffered a loss of approximately $2.5 million.

g.  In seeking the financing for **88 Hamilton Avenue**, DIMENNA submitted false financial information and fraudulent guarantees to Cedar Hill Capital, LLC in March 2015. Cedar Hill Capital, LLC, extended loans of approximately $4 million and has suffered a loss of approximately $4 million.

In seeking investment monies for his various real estate ventures from the Victim Investors, DIMENNA engaged in fraud by inducing certain initial investments through material misrepresentations and in failing to inform current investors of monies removed from certain projects for the benefit of other projects. The investors suffered significant losses on these ventures, including approximately $17 million taken from the Victims Investors for use on other projects.

In seeking investment monies from Victim Investors in or about 2012 through 2015 in the **Seaboard Stamford Investment Group** (SSIG), DIMMENA provided false promises that investment funds would be used for subsequent real estate purchases, when, in fact, DIMMENA knew he would use and did use the monies to support existing cash-losing projects. The Victim Investors in this entity lost approximately $6.5 million.

In seeking investment monies from Victim Investors in or about 2012 through 2015 regarding the **Stamford Resident Member Associates**, DIMMENA provided false financial information and represented that the solicited funds would be used for a specified real estate

Brian E. Spears, Esq.
*Page 15*

project, when, in fact, DIMMENA knew he would use and did use the monies to support existing cash-losing projects. The Victim Investors in this entity lost approximately $1.7 million.

During all relevant times, in seeking investment monies from Victim Investors in or about 2013 through 2015, for various projects including **Park Square West** and **88 Hamilton Avenue**, among others, DIMMENA sold subscription agreements for interests that were in excess of the available subscriptions in the properties. The Victim Investors investing in oversubscribed properties lost approximately $2.7 million.

From in or about November 2012, through in or about March 2016, in the District of Connecticut and elsewhere, the defendant JOHN DIMENNA knowingly, willfully and with intent to defraud, devised and intended to devise a scheme and artifice to defraud the Victim Lenders, including financial institutions identified above, affecting those financial institutions, by means of materially false and fraudulent pretenses, representations and promises, which scheme and artifice is in substance set forth above. As a result of the scheme, DIMENNA exposed the Victim Lenders to a risk of loss and, in fact, the Victim Lenders suffered significant losses.

On or about September 9, 2013, in the District of Connecticut and elsewhere, having devised and intended to devise a scheme and artifice to defraud the Victim Lenders by obtaining money and property by means of materially false and fraudulent pretenses, representations and promises as set forth above, and for the purpose of executing such aforementioned scheme and artifice, DIMENNA caused the transmission of certain items by means of wire communications in interstate commerce, namely, the wire transfer of $1.972 million from First County Bank in Connecticut in Connecticut to First American Trust, FSB, in California with the wiring passing through the Federal Reserve Bank outside of Connecticut.

From in or before January 2010, through in or about March 2016, in the District of Connecticut and elsewhere, the defendant JOHN DIMENNA knowingly, willfully and with intent to defraud, devised and intended to devise a scheme and artifice to defraud the Victim Investors by means of materially false and fraudulent pretenses, representations and promises, which scheme and artifice is in substance set forth above. As a result of the scheme, DIMENNA exposed the Victim Investors to a risk of loss and, in fact, the Victim Investors suffered significant losses.

On or about April 30, 2015, in the District of Connecticut and elsewhere, having devised and intended to devise a scheme and artifice to defraud the Victim Investors by obtaining money and property by means of materially false and fraudulent pretenses, representations and promises as set forth above, and for the purpose of executing such aforementioned scheme and artifice, DIMENNA caused the transmission of certain items by means of wire communications in interstate commerce, namely, a wire transfer of $500,000 from Bankwell Bank in Connecticut to TD Bank, NA, in New Jersey with the wiring passing through the Federal Reserve Bank outside of Connecticut.

Brian E. Spears, Esq.
*Page 16*

The parties agree that the relevant Guidelines sentencing fraud loss is at least $60 million. The defendant reserves the right to argue that the Guidelines fraud loss is just under $65 million, while the Government submits that the loss is approximately $69,617,685.38.

The parties agree that restitution is approximately $87,842,539.

This written stipulation is part of the plea agreement. The defendant and the Government reserve their right to present additional relevant offense conduct to the Court in connection with sentencing.

_____
JOHN DIMENNA
The Defendant

_____
CHRISTOPHER W. SCHMEISSER
Assistant United States Attorney

_____
BRIAN E. SPEARS
Attorney for the Defendant

Brian E. Spears, Esq.
*Page 17*

## RIDER CONCERNING RESTITUTION

The Court shall order that the defendant make restitution under 18 U.S.C. § 3663A. The order of restitution may include:

1. If the offense resulted in damage to or loss or destruction of property of a victim of the offense, the order of restitution shall require the defendant to:

   A. Return the property to the owner of the property or someone designated by the owner; or

   B. If return of the property is impossible, impracticable, or inadequate, pay an amount equal to:
   The greater of -
   (I) the value of the property on the date of the damage, loss, or destruction; or

   (II) the value of the property on the date of sentencing, less the value as of the date the property is returned.

2. In the case of an offense resulting in bodily injury to a victim –

   A. Pay an amount equal to the costs of necessary medical and related professional services and devices related to physical, psychiatric, and psychological care; including non-medical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;

   B. Pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and

   C. Reimburse the victim for income lost by such victim as a result of such offense;

3. In the case of an offense resulting in bodily injury that results in the death of the victim, pay an amount equal to the cost of necessary funeral and related services; and

4. In any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

The order of restitution has the effect of a civil judgment against the defendant. In addition to the court-ordered restitution, the court may order that the conditions of its order of restitution be made a condition of probation or supervised release. Failure to make restitution as ordered may result in a revocation of probation, or a modification of the conditions of supervised release, or in the defendant being held in contempt under 18 U.S.C. § 3583(e). Failure to pay restitution may also result in the defendant's re-sentencing to any sentence which might originally have been imposed by the Court. *See* 18 U.S.C. §§ 3614, 3613A. The Court may also order that the defendant give notice to any victim(s) of his offense under 18 U.S.C. § 3555.